

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00135-CV

CHAD LEE S.                                              APPELLANT

V.

MELINDA A. S.                                          APPELLEE

----------

### FROM THE 158TH DISTRICT COURT OF DENTON COUNTY
### TRIAL COURT NO. 2012-20066-158

----------

## MEMORANDUM OPINION[1]

----------

Appellant Chad Lee S. (Father) appeals from the trial court's final decree of divorce. After a trial on the conservatorship issues, the jury found that Appellee Melinda A. S. (Mother) should be the sole managing conservator of their child and that Father should not be possessory conservator. The trial court heard the remaining issues and entered judgment conforming to the jury's

---

[1]*See* Tex. R. App. P. 47.4.

verdict. In four issues, Father challenges the trial court's judgment with respect to the conservatorship of their child. We affirm.

## I. Background

Mother and Father began dating in the spring of 2008. They married in March 2011 and had one child in October 2011 (the Child). On January 25, 2012, Mother filed a divorce petition, seeking sole managing conservatorship of the Child. Mother also filed an application for protective order requesting, among other things, that the trial court prohibit Father from communicating directly with Mother or the Child and from coming within 200 feet of them.

Father filed a general denial and counterpetition for divorce and temporary orders. On February 8, 2012, the trial court entered agreed interim orders enjoining both parties from communicating with each other directly and from going within 200 feet of the other party's residence or place of employment. The agreed temporary orders also enjoined Father from taking or attempting to take the Child from Mother and ordered that the Child remain in Mother's exclusive possession and control pending a temporary hearing.

After a hearing on February 29, 2012, the trial court entered temporary orders appointing both parties as temporary joint managing conservators of the Child, with Mother having the exclusive right to determine the Child's primary residence. The trial court awarded Father possession of the Child for two hours every Tuesday and Thursday and for four hours every Sunday. The temporary

orders specified that the Child was to be surrendered to Father at Mother's residence and that Father was to return the Child to Mother at her residence.

On October 26, 2012, Father filed a motion to modify the temporary orders, alleging that Mother and Mother's parents were videotaping the exchanges of the Child "while attempting to provoke a negative reaction from [Father]. As such, the present orders relating to the exchange of the [C]hild have become unworkable and are no longer in the best interest of the [C]hild." Father asked the trial court to order the parties to exchange possession at a police station rather than Mother's residence. Father amended his motion to modify on April 24, 2013, requesting that the trial court allow Father to designate a competent adult to pick up the Child because Mother would not allow anyone other than Father to pick up the Child and increase his periods of possession and access because Mother refused to allow him possession and access to the Child beyond the periods awarded to Father in the temporary orders.

After a hearing on April 29, 2013, the trial court entered modified temporary orders increasing Father's periods of possession to four hours on Tuesdays and Thursdays and to eight hours on Sundays. Both parties were permitted to designate a competent adult to pick up and drop off the Child. The modified temporary orders also outlined a procedure for surrender and return of the Child at Mother's residence that prevented Mother and Father from having any direct contact with each other.

Over the course of five days in August 2013, the parties tried the conservatorship issue to a jury. Mother's live petition requested that she be appointed as sole managing conservator of the Child and that Father not be named as possessory conservator. The jury found that Mother should be appointed managing conservator and that Father should not be possessory conservator.

Immediately after the jury returned the verdict, the trial court announced that in light of the jury's findings, it was suspending all temporary orders and entered an order stating that Father not have possession of or access to the Child pending the entry of a final divorce decree. Father moved for a judgment non obstante verdicto (JNOV), asserting that the evidence was legally and factually insufficient to support the jury's verdict on possessory conservatorship and that the trial court erred in revoking Father's right to possession of and access to the Child based on that finding. *See* Tex. R. Civ. P. 301. The trial court denied the motion.

The trial court heard the child support and property division issues on September 17, 2013. On October 29, 2013, the trial court entered a final divorce decree, which incorporated the jury's verdict, denied Father conservatorship of, access to, and possession of the Child, ordered Father to pay child support, and divided the marital property.

Father timely filed a motion for new trial, arguing in part that family code sections 105.002(c) and 153.191 were unconstitutional as applied to him. *See*

4

Tex. Fam. Code Ann. §§ 105.002(c), 153.191 (West 2014); Tex. R. Civ. P. 320, 329b. He contended that

> [b]ecause of the [parental] right's elevated status, the standard of proof is elevated from "preponderance of the evidence" to "clear and convincing evidence." . . .
>
> . . . .
>
> The application of Section 153.191 to [Father] in this case and the court's ruling is a denial of constitutional rights of due process in that the court's ruling operates as a de facto termination of the parental rights of [Father] to care for, control, educate and manage the upbringing of his child with a lower standard of proof than that required by Section 161.001 Texas Family Code and the United States Constitution, which requires proof by clear and convincing evidence that a parent has committed any of a number of acts listed in the statute.

On January 17, 2014, the trial court granted Father a new trial as to conservatorship on the sole ground that Father's

> due process rights under the 14th Amendment of the United States Constitution and Article I, Section 19 of the Texas Constitution were violated when the jury did not name [him] a possessory conservator in Question #5 of the jury charge, creating a de facto termination under a preponderance of the evidence standard, rather than a clear and convincing standard.[2]

On the same date, the trial court also entered an interim order granting Father limited access to the Child.

Mother filed a petition for writ of mandamus in this court, asserting that the trial court acted arbitrarily and abused its discretion by disregarding the jury's

_____

[2]The trial court signed an identical order granting Father's motion for new trial on January 24, 2014.

5

verdict and ordering a new trial because the trial court's stated reason for granting a new trial was legally inappropriate. *See In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding) (holding a trial court does not abuse its discretion if its stated reason for granting a new trial is legally appropriate and is specific enough to indicate that the trial court "derived the articulated reasons from the particular facts and circumstances of the case at hand"). We agreed with Mother, stating

> While the trial court's reason here is specific, it is not a legally appropriate reason. The trial court's order granting a new trial based on Father's "de facto" termination argument violates section 105.002(c)(1)(C) of the family code, which provides that a trial court may not "contravene a jury verdict" on the issue of the appointment of a possessory conservator. The order also ignores the different burdens of proof in custody and termination cases. Finally, the trial court's order overlooks the law that allows a parent, even a nonconservator like Father, to seek modification of a conservatorship order and that gives a trial court discretion to grant modification if it is in the child's best interest and the parent's or child's circumstances have materially and substantially changed since the order was rendered. It is this law that differentiates Father from parents whose relationships with their children have been permanently severed, and it is this law that provides Father and other similarly situated parents due process.

*In re M.S.*, No. 02-14-00079-CV, 2014 WL 1510059, at *2 (Tex. App.—Fort Worth Apr. 17, 2014, orig. proceeding [mand. denied]) (mem. op.) (citations omitted). We granted Mother's petition and directed the trial court to vacate its orders granting Father's motion for new trial as well as its interim order granting Father access to the Child. *See id.* The trial court promptly vacated the orders

6

and re-entered its original final divorce decree. This decree is the subject of this appeal.

## II. Denial of Father's Motion for JNOV

In the first part of his first issue, Father contends the trial court erred by denying his motion for JNOV because family code section 105.002(c) did not prevent the trial court from contravening the jury's verdict not appointing Father as possessory conservator. *See* Tex. Fam. Code Ann. § 105.002(c). Section 105.002(c)(1)(C) provides that a trial court "may not contravene a jury verdict on the issue[] of . . . the appointment of a possessory conservator." *Id.* § 105.002(c)(1)(C). Father argues that because "non-appointment is not addressed in the statute, the trial court was free to contravene the jury's finding."

"Statutory construction is a legal question that we review de novo, ascertaining and giving effect to the Legislature's intent as expressed by the plain and common meaning of the statute's words." *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 683 (Tex. 2007) (citing *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004)). Section 105.002(c)(1)(C) states that the trial court may not contravene a jury verdict on the issue of the appointment of a possessory conservator. *See* Tex. Fam. Code Ann. 105.002(c)(1)(C). The "issue[] of . . . the appointment of a possessory conservator" necessarily includes both the appointment and "non-appointment" of a parent as possessory conservator. The jury decided this issue against Father. Thus, under the plain language of section 105.002(c)(1)(C), the trial court could

7

not grant Father's motion for JNOV. *See M.S.*, 2014 WL 1510059, at \*2 (concluding that order granting Father a new trial based on "de facto" termination argument violated section 105.002(c)(1)(C)). Accordingly, we overrule this portion of Father's first issue.

### III. Sufficiency of the Evidence Supporting the Jury's Conservatorship Findings

In the latter portion of his first issue and in his second issue, Father argues there is no evidence to support the jury's findings that he should not be appointed joint managing conservator or possessory conservator of the Child.

### A. Standard of Review

When, as here, no objection was made to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005). We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider

8

evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

The burden of proof in conservatorship cases is by a preponderance of the evidence. Tex. Fam. Code Ann. § 105.005 (West 2014); *see In re W.M.*, 172 S.W.3d 718, 724 (Tex. App.—Fort Worth 2005, no pet.) ("The burden of proof in conservatorship cases, as opposed to termination cases, is a preponderance of the evidence.").

9

## B. Appointment of Joint Managing Conservator

Family code section 153.131(a) provides that both parents shall be appointed as joint managing conservators of a child unless the court finds that appointment of the parents would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. Tex. Fam. Code Ann. § 153.131(a) (West 2014). A rebuttable presumption exists that it is in a child's best interest for his parents to be named his joint managing conservators. *Id.* § 153.131(b) (West 2014). Father asserts that the jury's finding that he should not be appointed as joint managing conservator implied that Mother rebutted the presumption that he should be appointed as such. Father argues this finding is not supported by the evidence.

A finding of a history of family violence removes the presumption that appointment of a child's parent as joint managing conservator is in the child's best interest. *Id.* With regard to the appointment of managing conservator, the jury was instructed in pertinent part as follows:

> In determining whether to appoint a party sole or joint managing conservator, you shall consider evidence of the intentional use of abusive physical force by a party against his or her spouse, against a parent of the child, or against any person younger than eighteen years of age committed within a two-year period preceding the filing of the suit or during the pendency of the suit.

> A person may not be appointed a joint managing conservator if that person has a history or pattern of past or present child neglect or of physical or sexual abuse directed against a parent, a spouse, or a child.

Mother testified that Father was physically abusive towards her both prior to and during their marriage, but as to the events occurring prior to their marriage, Mother did not specify when they occurred.[3] Mother testified that during an argument shortly after their wedding ceremony in Mexico in March 2011, Father pushed her and pushed at her stomach even though she was pregnant with the Child. Mother further stated that Father never hit her during her pregnancy, but he pushed her, pushed at her stomach, and threw things at her. Shortly after Mother gave birth to the Child, Father bit Mother during an argument over whether Father should take the Child to a birthday party. Mother was holding the Child at the time, and Father attempted to pull the Child away from her.[4]

Mother testified that in the eight months from the beginning of the marriage until they separated and Mother filed for divorce, Father physically assaulted her "too many [times] to even count." Father left bruises and bite marks on Mother. Mother's friend, K.M., testified that while Mother and Father were married but before they were separated, she observed bruises on Mother's arm. After Mother and Father separated, Mother told K.M. that Father had caused the bruises. Mother never told K.M. that Father hit her. But prior to the separation,

---

[3]Before they were married, Father pushed and shoved her, pushed her to the ground, raised his fist to her and said, "Don't make me do something I will regret," locked her in her bedroom, and pushed her out of his vehicle.

[4]Mother's two children from a previous marriage, who lived with Mother and Father after their marriage, witnessed this event, as well as other instances of Father physically abusing Mother after the marriage.

11

Mother told K.M. that she was scared of Father and talked about "some of the physical abuse." K.M. never saw Father become physically violent with Mother, nor did she ever see or hear him threaten Mother.

Mother further testified that she fled the marital residence in January 2012 after an argument over the telephone with Father during which he threatened, "I'm leaving work and this time I'm going to come home and show you what I mean." Mother interpreted this as a physical threat and left before Father got home. Mother spent the night at her parents' house. During the early morning hours, Father began banging on the door and yelling. Mother cracked open the door, and Father barged into the house. He pushed Mother, yelled, called her names, and accused her of hijacking his son. Mother was afraid and asked Father to leave, but he refused until she called 911.

Two days later, Mother returned to the marital residence because Father promised to change his behavior and because she wanted to save their marriage. Mother testified that Father's behavior was erratic and controlling; he dictated how Mother was to sit and how she was to hold his hand and would not allow Mother to leave the residence alone. That night, Mother chose to sleep in one of her older children's rooms upstairs so she could be close to the Child. Father woke Mother in the middle of the night, angry that she was not sleeping with him in his bed and yelling at her that she was to be down in his room and "to do what she was told." When Mother refused, Father continued to yell at her and pushed her. Mother was fearful and called the police. The police arrived and

12

waited with Mother while she packed some items before leaving the marital residence for the last time.

Mother testified that Father never physically harmed her children when they lived with Father. But she also testified that Father spanked her oldest child so hard that it left a welt. Without elaboration, she stated that Father was very rough with the Child.

Mother admitted that she married Father despite his abusive behavior. She also admitted that she never called the police prior to their separation and that she never brought charges against Father. Father denied that he ever hit or pushed Mother and testified that Mother often instigated physical violence in the home. According to Father, Mother pushed or charged him using the Child as a buffer "dozens" of times.

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819 (footnote omitted). Here, the jury could have believed Mother's testimony regarding Father's physical abuse and disbelieved Father. There was more than a scintilla of evidence that Father had a history or pattern of physical abuse directed against Mother. Therefore, we hold that the evidence was legally sufficient to support the jury's finding that Father should not be appointed as joint managing conservator of the Child.

## C. Appointment of Possessory Conservator

Family code section 153.191 provides that a parent who is not appointed as a sole or joint managing conservator shall be appointed as a possessory conservator unless the court finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child. Tex. Fam. Code Ann. § 153.191. Father asserts that the jury's finding that he should not be appointed as possessory conservator implies that the jury found that such an appointment was not in the Child's best interest and that Father's possession or access would endanger the Child's physical or emotional welfare. Father argues the evidence is legally insufficient to support these findings.

The jury was instructed on possessory conservatorship as follows:

> A parent may not be allowed access to a child if the parent has a history or pattern of committing family violence during the two years preceding the date of the filing of the suit or during the pendency of the suit unless awarding access to the child would not endanger the child's physical health or emotional welfare and would be in the child's best interest.

> "Family violence" means an act by a member of a family against another member of the family that is intended to result in physical harm.

> . . . .

> "Possessory conservator of a child" means the person or persons appointed to have possession of or access to the child at specified times and upon certain conditions. In addition to the rights and duties listed above that a parent named a conservator has at all times or during periods of possession of the child, subject to any limitations imposed by court order on those rights and duties, a

14

parent appointed possessory conservator has any other right or duty of a managing conservator expressly granted to that parent in the decree appointing that parent a possessory conservator.

. . . .

If, in answer to Question 1, you have not named [Father] managing conservator of the child, then answer Question 5. Otherwise, do not answer Question 5.

**QUESTION 5:**

Should [Father] be named possessory conservator of the child?

A parent who is not appointed managing conservator shall be appointed possessory conservator unless the appointment is not in the best interest of the child and possession or access by the parent would endanger the physical or emotional welfare of the child. A parent who is not appointed managing or possessory conservator may be ordered to perform other parental duties, including paying child support. Therefore, answer the following question "Yes" unless you find from a preponderance of the evidence that appointment of [Father] is not in the best interest of the child and that possession or access by [Father] would endanger the physical or emotional welfare of the child.

Answer "Yes" or "No."

The jury answered "no."

Dr. Kelly Goodness, who was appointed by the trial court to evaluate Father's psychological condition, testified that in 1993, Father incurred a frontal lobe brain injury that affects his behavior. The injury causes Father to act impulsively, inhibits his memory capability and his ability to interpret people's body language and what they are saying, and prevents him from fully recognizing his deficits and from "presenting favorably" to others, which likely affects his ability to maintain steady employment. Dr. Goodness also stated that Father has

15

problems with impulse and anger control, which likely played a role in his criminal history, which includes a revocation of probation for failing a drug test and convictions for driving while intoxicated, resisting arrest, burglary of a habitation, assault, possession of prohibited weapons, and interfering with an emergency call. According to Dr. Goodness, Father's deficit may affect his ability to parent because he may have a lower frustration tolerance when the Child acts out or cries, have trouble remembering what needs to be done, be quick to anger, use bad language, and lack problem-solving abilities.

Dr. Goodness testified that Father's brain deficit is not huge, but it must be considered when developing a parenting plan. Both parents should participate in the parenting of a child unless it is detrimental to the child, and Dr. Goodness stated that she believed Father "needs the opportunity to parent his child. His deficits are not significant enough that he should be prevented from doing that."

Dr. Goodness testified that Father showed signs of recovery from his brain injury but had not made a complete recovery; his condition probably will not improve. Father's mother does not accept that Father has any deficits. Father also does not believe or recognize he has any deficits remaining from his brain injury.

Dr. Goodness recommended that Father consult with a psychiatrist for medication and see a counselor once or twice a month. While counseling would not eradicate Father's lack of insight, his difficulty recognizing social cues, or his low-frustration tolerance, it might help him in recognizing and addressing these

16

issues. Dr. Goodness referred Father to a licensed professional counselor in her office, but Father did not follow up on her recommendation. She had not seen Father since she completed her evaluation and filed her report with the court, and Father did not follow her suggestion that he make an appointment with her office to review his test results.

Mother admitted that Father had bonded with and had a close relationship with her two children from her previous marriage. Father helped with the day-to-day care of the children and played with them. Mother testified that Father "did a lot" for the children and that "she trusted [Father] to be heavily involved" in her children's lives, but she did not want him heavily involved in raising the Child. Several Father's Day and anniversary cards in which Mother expressed her love and appreciation for Father were admitted into evidence. Mother stated that she gave these cards to Father because she wanted their relationship to work.

Mother testified that over time, she became fearful of Father and became more fearful of him after the marriage because Father's behavior escalated. In addition to being physically abusive, Father was emotionally abusive. For example, during their altercation in Mexico, Father told Mother she could do what she wanted with the baby and threatened to leave her there. After the marriage, Father would call Mother names in front of her children and tell her children that Mother was ungrateful, selfish, and a horrible "C word."[5]

---

[5]It is apparent from Mother's testimony that Father used the actual term when referring to her.

Father had frequent emotional outbursts during which he would yell and curse at the children and belittle Mother. During a disagreement over her children's safety while riding four-wheelers with Father, he told Mother to "do as you're told, get the F out, [and] I'll do what I want." Mother would call her parents when she and Father argued, and Father told Mother on several occasions, "if you're going to call your dad, then I'm going to shoot him for trespassing. Tell your dad I'm going to shoot your dad." When Mother fled the marital residence, Father told her she needed a shock collar like a dog.

Mother's parents' neighbor, E.H., was inside their house during some of the custody exchanges. On at least two or three occasions, E.H. heard Father tell Mother that if her father were there, Father would kill him.

J.S., who lives down the street from Mother's parents, witnessed Father arriving at Mother's parents' house to pick up the Child. Father came speeding up the street and grabbed the Child (who was three months old at the time) from Mother's arms. The Child was screaming, and when Mother told Father that the Child needed his pacifier, Father responded, "No, he doesn't, bitch." Mother did not respond. Father put the Child into the baby seat in his car and, without taking any time to buckle him in, slammed the car door and sped off.

Mother's father, C.C., recounted two incidents in which Father threatened him. C.C. was out on a walk around his neighborhood when he encountered Father running in the opposition direction. Father turned around and began walking beside C.C. C.C. felt scared. Father commented that C.C. did not have

18

his phone with him, called C.C. and Mother names, and told C.C., "If I ever—if you ever stiff me again, I'm going to bash your head in." C.C. started walking towards a nearby school and told Father that he was going to call the police when he got there. Father ran off.

C.C. also recounted an incident during which Father followed C.C. and Mother's mother while they were driving in their neighborhood. Afraid, C.C. pulled into a golf course maintenance area where he knew other people would be. As Father drove by, he rolled down his window and said to C.C., "What's up, asshole?" C.C. waited for about ten minutes before leaving the golf course to return home. Father immediately started following the couple again.

Father recorded part of this incident, and the video was played to the jury. The video begins as C.C. is turning out of the golf course maintenance area and onto the street. It appears from the video that Father was waiting for C.C. to leave. The video shows Father following C.C. very closely after C.C. left the golf course. Father, in his narration on the video, claims the video is an example of how C.C. follows him around town and harasses him. On cross-examination, Father admitted that he drove by the golf course and called C.C. an asshole, and he insisted that the video exemplified how C.C. followed him and harassed him.

Father testified that he loved Mother and her children so much that he sold his interest in his family's ranch—against his dying father's wishes—to purchase a home for them. Father confirmed that he helped in the day-to-day care of

19

Mother's children and played with them.  He also attended their sports practices and games and parent-teacher conferences and PTA meetings with Mother.

Father admitted to the criminal history described by Dr. Goodness.  Most recently, Father received citations for operating a boat with two children under the age of thirteen (his nieces) onboard who were not wearing life jackets.  He admitted to using illegal drugs as an adult, including marijuana, methamphetamine, cocaine, and mushrooms.  Father also recounted the events leading up to his assault conviction.  When Father and a friend were out driving one day, they saw R.B.—a man who allegedly raped Father's sister thirteen years earlier but was not charged—outside of R.B.'s home.  Father got out of his car and assaulted R.B.  Father admitted that he initiated contact with R.B. and said that pent-up anger led to the assault.

Father also admitted that he engaged in behavior designed to alienate the Child from Mother and her family by speaking negatively about Mother in front of the Child.  Two videos of custody exchanges were played for the jury.  In the first, when Mother handed the Child to Father, he remarked, "You have one of your Mommy's cold sores, it looks like."  As he walked to his car, Father asked the Child, "Did Mommy give you herpes?"  Father then yelled from the curb, "Is it herpes, [Mother]?  Do you know?  Have you had it checked?"  In the second, as he took the Child to his car, he asked, "Are you going to . . . meet your new

Mommy?"[6] and tells the Child, "Say goodbye to those people," i.e., Mother and Mother's family.

While Father denied Mother's accusations of physical and emotional abuse, he admitted to having physical altercations with her in the past, as well as during some of the custody exchanges. He denied that any of the physical altercations involved him pushing Mother away or pulling the Child away from Mother.

The jury viewed video recordings of some of the custody exchanges. In one, Father was returning the Child to Mother. Mother reached for the Child repeatedly, but Father kept backing away and pushed Mother away with his elbow. The Child started to cry. Father denied that the video showed him elbowing Mother away.

The next video also showed Father returning the Child to Mother. Mother reached for the Child repeatedly, and Father pushed her away while asking about the Child's diaper rash. The Child started to cry. C.C. was also present. After Father eventually handed the Child to Mother, Father advanced towards C.C. and said, "[C.C.], go inside. Quit threatening me." C.C. remained stationary and said, "I'm not threatening you, [Father]." Father kept advancing towards C.C. and said, "Quit threatening me. Please get out, please, please get out of my face." Father denied that the video showed him pushing Mother and acting

---

[6]The Child's "new mommy" was Father's longtime girlfriend.

aggressively. Father testified that he thought his conduct was appropriate in both videos.

Father's mother testified that Father was "patient and kind and loving" with the Child. During his periods of possession, Father was observant of the Child's needs, insisted that the Child eat healthy foods, and took care of the Child, including changing his diapers. Father also played with the Child, took him swimming and boating, and read to him. She testified that the Child had bonded with Father, loved Father, followed Father around during visits, and wanted only Father to hold him. She had no concerns about the way Father cared for the Child, but she was concerned about Mother's parenting skills because of her volatile behavior.

Father's mother testified that Father sought counseling after receiving Dr. Goodness's recommendation but did not know if he was still attending counseling or for how long he did so. She confirmed that Father was not seeking medication as Dr. Goodness recommended.

Because "best interest" and "endanger" were undefined in the charge, we look to the terms' commonly understood meanings in our sufficiency review. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000); *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 869 (Tex. App.—Dallas 2008, no pet.). A common meaning of "best" is "providing or offering the greatest advantage, utility, or satisfaction," and the common meaning of "interest" is "the state of being concerned or affected esp. with respect to advantage or well-being." Webster's Third New International

22

Dictionary 208, 1178 (2002). "Endanger" is defined as "imperil or threaten danger to." *Id.* at 748.

Again, "[j]urors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another." *City of Keller*, 168 S.W.3d at 819 (footnote omitted). Father loves, has bonded with, and wants to parent the Child, and Dr. Goodness testified that Father should be allowed to parent the Child. But Dr. Goodness also testified that Father did not recognize that he had a mental deficit, and the evidence showed that Father was not following her recommendations regarding counseling and medication. The evidence showed that Father had a volatile personality, was quick to anger, lacked impulse control, and was unable or unwilling to recognize that his behavior was physically aggressive, even when confronted with video recordings of the incidents. Father had a criminal history, including assault and operating a boat without ensuring that the children onboard were wearing life vests, and had a history of physically and emotionally abusing Mother, sometimes in front of the Child. Father admitted to engaging in specific instances of behavior designed to alienate the Child from Mother and her family, videos of which were played for the jury.

Applying the applicable standard of review, we conclude that there was more than a scintilla of evidence to support the jury's conclusion that appointment of Father as possessory conservator was not in the best interest of the Child and that access to or possession by Father would endanger the Child's

23

physical or emotional welfare. Accordingly, we overrule the remainder of Father's first issue and his second issue.

### IV. Father's Access to and Possession of the Child

In his third issue, Father asserts that even if family code section 105.002(c) prevented the trial court from contravening a jury verdict and regardless of whether the jury appointed Father as possessory conservator, the trial court was not prohibited from granting Father access to or possession of the Child. Section 105.002(c)(1) entitles a party to a jury verdict on the issue of appointment of a possessory conservator, *see* Tex. Fam. Code Ann. § 105.002(c)(1)(C), but section 105.002(c)(2)(B) prohibits a trial court from submitting a jury question on the issue of a specific term or condition of possession of or access to a child, *id.* § 105.002(c)(2)(B). Father argues the trial court abused its discretion by denying him access to or possession of the Child based upon the jury's finding that Father should not be appointed as possessory conservator, *see id.*, thereby imposing restrictions or limitations on his possession and access that exceed what is required to protect the Child's best interest, *see id.* § 153.193 (West 2014). Father further argues that a "complete denial of access should be rare," *In re Walters*, 39 S.W.3d 280, 287 (Tex. App.—Texarkana 2001, no pet.), and reserved only for "the most extreme of circumstances," *In re E.N.C.*, No. 03-07-00099-CV, 2009 WL 638188, at *15 (Tex. App.—Austin Mar. 13, 2009, no pet.) (mem. op.).

## A. Standard of Review

The best interest of the child shall always be the primary consideration of the court in determining the issues of possession of and access to the child. Tex. Fam. Code Ann. § 153.002 (West 2014). We review a trial court's order regarding possession and access for an abuse of discretion. *See Green v. Green*, 850 S.W.2d 809, 811–12 (Tex. App.—El Paso 1993, no writ). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). Under an abuse of discretion standard, challenges to the legal or factual sufficiency of the evidence are not independent grounds of error; rather, they are simply factors in assessing whether the trial court abused its discretion. *Gardner v. Gardner*, 229 S.W.3d 747, 751 (Tex. App.—San Antonio 2007, no pet.).

In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have enough information upon which to exercise its discretion; and (2) did the trial court err in applying its discretion? *W.M.*, 172 S.W.3d at 725; *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied). The traditional sufficiency review comes into play with regard to the first question. *W.M.*, 172 S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872. With regard to the second question, we determine, based on the

elicited evidence, whether the trial court made a reasonable decision. *W.M.*, 172

S.W.3d at 725; *T.D.C.*, 91 S.W.3d at 872.

## B. Analysis

The final decree stated that Father "shall not exercise, or attempt to

exercise, possession of or access to the [Child]." The trial court has wide latitude

to determine whether a parent should have possession of and access to a child,

and we should not disturb a reasonable decision made within its discretion. *See*

*In re J.E.P.*, 49 S.W.3d 380, 386 (Tex. App.—Fort Worth 2000, no pet.). The

family code mandates that "the terms of an order that denies possession of a

child to a parent or imposes restrictions or limitations on a parent's right to

possession of or access to a child may not exceed those that are required to

protect the best interest of the child."[7] Tex. Fam. Code Ann. § 153.193. While a

jury may determine conservatorship issues, the trial court has the discretion to

determine the specific terms and conditions of access and possession.[8] *See id.*

---

[7]Even though section 153.193 does not envision a complete denial of access, "a severe restriction or limitation, even one that amounts to a denial of access, is permissible if it is in the best interest of the child" because the best interest of the child is the primary consideration in determining issues of possession and access. *In re Walters*, 39 S.W.3d 280, 286 n.2 (Tex. App.— Texarkana 2001, no pet.) (citing Tex. Fam. Code Ann. § 153.002).

[8]During oral argument, Mother argued that section 153.193 did not apply because the section is under a subchapter entitled "Parent Appointed as Possessory Conservator." Thus, in order for the limitations in section 153.193 to apply, Father must have been appointed as possessory conservator. But the language of section 153.193 does not limit its application to parents appointed as possessory conservators. *Compare* Tex. Fam. Code Ann. § 153.193 ("The terms of an order that denies possession of a child to a *parent* or imposes restrictions

26

§§ 105.002(c)(2)(B); 153.193; *cf. Walters*, 39 S.W.3d at 290 (holding parent was only entitled to a jury verdict on conservatorship).

Father contends the trial court abused its discretion because there was no evidence to support the trial court's decision to deny Father access to or possession of the Child. He points out that orders completely denying a parent access to a child when there are no extreme grounds to support the order are frequently reversed and remanded for the trial court's reconsideration and determination of the appropriate amount and type of access and any necessary conditions. *See, e.g., Fish v. Lebrie*, No. 03-09-00387-CV, 2010 WL 5019411, at *8–11 (Tex. App.—Austin Dec. 10, 2010, no pet.) (mem. op.); *E.N.C.*, 2009 WL 638188, at *15–18; *Walters*, 39 S.W.3d at 287. He urges us to do the same here. The primary cases relied upon by Father, however, all concern parents who were appointed as conservators. *See Fish*, 2010 WL 5019411, at *1 (stating that father was joint managing conservator); *E.N.C.*, 2009 WL 638188, at *14 (stating that mother was possessory conservator); *Walters*, 39 S.W.3d at 287 ("[T]he trial court appointed Deborah possessory conservator, which implies a

---

or limitations on a *parent's* right to possession of or access to a child may not exceed those that are required to protect the best interest of the child.") *with id.* § 153.192(a) (West 2014) ("Unless limited by court order, a *parent appointed as possessory conservator* of a child has the rights and duties provided by Subchapter B and any other right or duty expressly granted to the possessory conservator in the order.") *and id.* § 153.192(b) (West 2014) ("In ordering the terms and conditions for possession of a child by a *parent appointed possessory conservator*, the court shall be guided by the guidelines in Subchapter E."). The heading of a subchapter does not limit or expand the meaning of a statute. Tex. Gov't Code Ann. § 311.024 (West 2013).

finding that any danger she poses to Christopher's physical or emotional welfare can be remedied by an order that restricts her access or possession."). There is a distinction between cases in which the trial court appoints a parent as a conservator but denies the parent any possession of and access to the child and a case such as this one in which the jury finds that the parent should not be appointed as possessory conservator, implicitly finding that possession and access would endanger the child's physical or emotional welfare and are not in his best interest.[9]

Here, the jury found that Father should not be appointed as possessory conservator, and as we explained above, the evidence was legally sufficient to support the jury's implicit findings that appointment of Father as possessory conservator was not in the Child's best interest and that Father's possession and access would endanger the Child's physical or emotional welfare. The trial court

---

[9]*Green* is the only case we have found in which an appellate court affirmed the trial court's complete denial of access in the context of a divorce. *See* 850 S.W.2d at 810–11, 813. Unlike the cases relied upon by Father, the father in *Green* was not appointed as conservator. *Id.* at 811. The appellate court concluded that the evidence was legally and factually sufficient to support the trial court's finding that it was in the child's best interest not to appoint the father as possessory conservator and not to give him access to or possession of the child. *Id.* at 812–13. But there are cases upholding the complete denial of access in the termination context when the parent's rights have not been terminated. *See, e.g., J.C. v. Tex. Dept. of Family & Protective Servs.*, No. 03-12-00670-CV, 2013 WL 1405892, at *8 (Tex. App.—Austin Apr. 3, 2013, no pet.) (mem. op.) (holding that trial court did not abuse its discretion in denying father visitation and access to children "at this time"); *In re W.H.M.*, No. 01-00-01396-CV, 2003 WL 22254713, at *9–10 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.) (upholding jury's implied findings that allowing father any access to child would endanger the child's physical or emotional welfare).

28

had discretion to determine the specific terms and conditions of access. *See* Tex. Fam. Code Ann. § 153.193. In light of the jury's implicit findings, we are unable to conclude that the trial court abused its discretion by denying Father possession of and access to the Child. *See id.* Accordingly, we are constrained to overrule Father's third issue.

## V. De Facto Termination

In his fourth issue, Father alternatively argues that if section 105.002(c) permitted the jury to deny access and possession as well as conservatorship, then family code sections 105.002(c) and 153.191 operated in concert unconstitutionally as applied to him because these sections allowed the jury to effectuate a de facto termination of his parental rights under a preponderance of the evidence standard. As we stated in our opinion granting Mother's mandamus petition, the burden of proof in a custody case differs from that in a termination proceeding. *See M.S.*, 2014 WL 1510059, at *2 (citing *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the quantum of proof required to support termination from that required to support a conservatorship decision); Tex. Fam. Code Ann. § 105.005 (providing that findings must be based on a preponderance of the evidence unless otherwise provided by title 5 of the family code); Tex. Fam. Code Ann. § 161.001(b) (West Supp. 2015) (stating that evidence supporting findings in termination proceedings must be clear and convincing)). Father, even though he was not appointed conservator, can seek modification of the conservatorship order, and the trial court has discretion to grant the

29

modification if it is in the child's best interest and the parent's or child's circumstances have materially and substantially changed since the order was rendered. *See id.* (citing Tex. Fam. Code Ann. §§ 102.003(a)(1), 156.001–.002, 156.101 (West 2014 & Supp. 2015)). "It is this law that differentiates Father from parents whose relationships with their children have been permanently severed, and it is this law that provides Father and other similarly situated parents due process." *Id.* (citing *J.A.J.*, 243 S.W.3d at 617 (rejecting parent's argument that requiring separate challenges to conservatorship decisions and termination orders will result in the de facto termination of parental rights for parents who win their termination appeals and noting that the family code "guards against that possibility," citing sections 102.003, 156.001, and 156.101 of the family code)). Accordingly, we overrule Father's final issue.

## VI. Conclusion

Having overruled each of Father's four issues, we affirm the trial court's judgment.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and GABRIEL, JJ.

GABRIEL, J. concurs without opinion.

DELIVERED: December 3, 2015

30